No. 19-1378

UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

ARKANSAS TIMES LP,
Plaintiff-Appellant,

v.

MARK WALDRIP, in his Official Capacity as
Trustee of the University of Arkansas Board of Trustees; ET AL.,
Defendants-Appellees.

On Appeal from the United States District Court for the
Eastern District of Arkansas
No. 4:18-CV-00914 BSM (Hon. Brian S. Miller)

**Defendants-Appellees' Petition for Rehearing En Banc**

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

VINCENT M. WAGNER
  Deputy Solicitor General

DYLAN L. JACOBS
ASHER STEINBERG
  Assistant Solicitors General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ............................................................................................ ii

Rule 35(b)(1) Statement ....................................................................................1

Background ...........................................................................................................2

Argument..............................................................................................................9

    I.   The majority's boycott analysis conflicts with Supreme Court
        precedent.................................................................................................9

    II.  The majority's opinion undermines basic principles of statutory
        construction............................................................................................15

Conclusion .........................................................................................................19

Certificate of Compliance ...............................................................................20

Certificate of Service .......................................................................................21

Appellate Case: 19-1378    Page: 2    Date Filed: 03/29/2021 Entry ID: 5019680

# TABLE OF AUTHORITIES

**Cases**

*Compton v. State*,
143 S.W. 897 (Ark. 1911)...................................................16

*Edwards v. Campbell*,
370 S.W.3d 250 (Ark. 2010) ............................................16

*FTC v. Superior Ct. Trial Lawyers Ass'n*,
493 U.S. 411 (1990)...........................................................14

*Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.*,
456 U.S. 212 (1982)..................................................... 14, 15

Order, *Jordahl v. Brnovich*,
No. 18-16896 (9th Cir. Oct. 31, 2018), ECF No. 26 .............. 5, 10, 11

*Jordahl v. Brnovich*,
336 F. Supp. 3d 1016 (D. Ariz. 2018) ............................6, 12

*Koontz v. Watson*,
283 F. Supp. 3d 1007 (D. Kan. 2018)..................................6

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
138 S. Ct. 1719 (2018)......................................................14

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982)......................................................6, 13

*Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*,
167 F.3d 458 (8th Cir. 1999) ............................................18

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006)...................................................... *passim*

*Telescope Media Grp. v. Lucero*,
936 F.3d 740 (8th Cir. 2019) ............................................14

*Universal Coops., Inc. v. AAC Flying Serv., Inc.*,
710 F.3d 790 (8th Cir. 2013) ............................................16

*Wallis v. State*,
16 S.W. 821 (Ark. 1891).....................................................16

Appellate Case: 19-1378     Page: 3     Date Filed: 03/29/2021 Entry ID: 5019680

## Statutes

50 U.S.C. 4841 .................................................................................2

50 U.S.C. 4842 .................................................................................2

Ark. Code Ann. 25-1-502 ..............................................................2, 3

Ark. Code Ann. 25-1-503 ..............................................................2, 3

Ark. Code Ann. 25-1-504 .................................................................2

## Other Legislative Materials

Pub. L. No. 96-72, 93 Stat. 503 (1979)............................................2

Act 710, 2017 Ark. Acts 3627 (Mar. 27, 2017)...............................2

Deutscher Bundestag, Drucksachen [BT] 19/10191 .......................2

## Other Authorities

Palestine Legal, *State Legislation* (updated Mar. 25, 2021)...........2

Br. for Respondents, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
547 U.S. 47 (2006) (No. 04-1152), 2005 WL 2347175 ................5, 10

The Associated Press, *German parliament denounces Israel boycott movement*,
(May 17, 2019).................................................................................2

Appellate Case: 19-1378    Page: 4    Date Filed: 03/29/2021 Entry ID: 5019680

# RULE 35(b)(1) STATEMENT

Nearly two-thirds of the States prohibit their business partners from boycotting Israel. Their laws—including the Arkansas law at issue here and four others in this circuit—reflect a national consensus that taxpayers shouldn't do business with those who discriminate against a crucial American ally. The majority's decision places all those laws in jeopardy, and this case therefore presents a question of profound importance both for courts throughout this circuit and nationally. That alone warrants en banc review.

Two additional reasons further underscore why such review is necessary. *First*, the majority's boycott analysis—particularly its conclusion that refusals to deal "in association with others" (Op. 14) are protected by the First Amendment—conflicts with *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) (*FAIR*). Indeed, as the district court held below, that case decides this one. Yet the majority didn't even attempt to distinguish *FAIR*; it simply deemed it inapplicable.

*Second*, in a rush to shore up—and distract from—its flawed boycott analysis, the majority undermined hornbook principles of statutory construction. Its decision disregarded basic canons of statutory construction used to interpret state laws throughout this circuit in favor of a sweeping inquiry designed to manufacture

1

constitutional difficulties.  If allowed to stand, this will complicate adjudication and render this Court an outlier.

## BACKGROUND

1.  Like laws across the country, the Arkansas provision at issue here, Act 710, seeks to eliminate economic discrimination against the Jewish State.  *See generally* Act 710, 2017 Ark. Acts 3627 (Mar. 27, 2017); *see also* 50 U.S.C. 4841-4842, *prior version*, Pub. L. No. 96-72, 93 Stat. 503 (1979).[1]  Such discrimination has a dark history, with the German parliament observing in 2019 that the anti-Israel boycott "movement's 'Don't Buy!' stickers on Israeli products inevitably awake associations with the Nazi slogan 'Don't Buy from Jews!'"[2]

Act 710 is designed to ensure taxpayers don't fund such discriminatory conduct.  It does so by generally barring "public entit[ies]" and "political subdivision[s]" from doing business with entities that "boycott Israel."  Ark. Code Ann. 25-1-502(1), (5); *see id.* 25-1-503, -504.  Consistent with its underlying goal of stamping out economic discrimination, Act 710 narrowly defines a "boycott" as "engaging in refusals to deal, terminating business activities, or other actions that

---

[1] Since the panel-stage briefing, the number of States with similar laws has increased to 32.  *See* Appellees' Br. 1 n.1; Palestine Legal, *State Legislation* (updated Mar. 25, 2021), https://bit.ly/31nevUF.

[2] The Associated Press, *German parliament denounces Israel boycott movement*, (May 17, 2019), http://bit.ly/2Qw1DJX; *see* Deutscher Bundestag: Drucksachen [BT] 19/10191, https://bit.ly/394ILI9 (German-language resolution).

Appellate Case: 19-1378     Page: 6     Date Filed: 03/29/2021 Entry ID: 5019680

are intended to limit commercial relations with Israel, or persons or entities doing business in Israel or in Israeli-controlled territories, in a discriminatory manner." *Id*. 25-1-502(1)(A)(i). And to make that statute effective, Act 710 requires public contracts to include "a written certification that the [contractor] is not currently engaged in, and agrees for the duration of the contract not to engage in, a boycott of Israel." *Id.* 25-1-503(a)(1).

Thus, as relevant here, Act 710 narrowly regulates commercial conduct and only prohibits contractors from refusing to deal based solely on national origin. Indeed, consistent with Act 710's plain text, Arkansas has *never* argued that it restricts a contractor's ability to criticize Israel or argue for national-origin discrimination. *See* Oral Argument at 17:40 (counsel for Arkansas offering this interpretation); Appellees' Br. i ("Contractors remain free to . . . advocate boycotting."); ADD9 (statute doesn't reach "calls to boycott Israel").

2. Plaintiff-Appellant Arkansas Times is an alternative media company that hasn't boycotted, doesn't intend to boycott, and hasn't advocated boycotting Israel. *See* JA88-90; ADD3; Appellant's Br. 39. Yet it sued to argue that requiring it—as an entity that occasionally runs advertisements for public institutions—to certify that it won't discriminate violates the First Amendment. JA12-13. In fact, it only brought this lawsuit after spending months unsuccessfully trolling for another

3

plaintiff, *see* JA80-86, and after it had been subject to Act 710 for more than a year, *see* JA10-13, 18-19.

3. Arkansas moved to dismiss the complaint for failure to state a claim. *See* ADD1. Concluding Arkansas Times hadn't shown "a boycott of Israel, as defined by Act 710, is protected by the First Amendment," the district court granted Arkansas's motion. ADD7-8.

The district court began by explaining that Act 710 doesn't restrain "speech." It only restricts *conduct*, because "a refusal to deal, or particular commercial purchasing decisions, do not communicate ideas through words or other expressive media." ADD10. And it explained that Act 710's "other actions" language didn't suggest the contrary. Rather, *ejusdem generis* required reading that phrase in light of the enumerated items, "refusals to deal" and "terminating business activities." *Id.* So read, the district court continued, Act 710 only covered "commercial conduct"—namely, "a contractor's purchasing activities." ADD9. And in any event, that court added, another "[f]amiliar canon[]," constitutional avoidance, reinforced that reading. *Id*.

The district court then correctly concluded that *FAIR* required dismissing Arkansas Times's complaint. *See* ADD9-12. That case involved an association of law schools that collectively decided to bar military recruiters from their campuses to protest the military's "Don't Ask, Don't Tell" policy. *See FAIR*, 547 U.S. at 51.

4

In response to that "sort of boycott," Respondents' Br., *FAIR*, No. 04-1152, 2005 WL 2347175, at *29, Congress barred participating schools from receiving federal funds. The law schools claimed that violated the First Amendment. 547 U.S. at 52-55. But as the district court explained, a unanimous Supreme Court made short work of that argument, holding boycotts are not "inherently expressive conduct" subject to First Amendment protection. ADD10. To the contrary, such "actions 'were expressive *only* because the law schools accompanied their conduct with speech explaining it.'" *Id.* (quoting *FAIR*, 547 U.S. at 66).

The same is true here, reasoned the district court. Whether boycotting military recruiters or Israel, "the decision to engage in a primary or secondary boycott of [either] is 'expressive only if it is accompanied by explanatory speech.'" ADD11 (quoting *Jordahl v. Brnovich*, No. 18-16896 (9th Cir. Oct. 31, 2018) (Ikuta, J., dissenting from stay denial), ECF No. 26 at 5). Thus, if Arkansas Times decided to boycott, it "would have to explain to an observer that it is engaging in a boycott for the observer to have any idea that a boycott is taking place." *Id.* Otherwise, even someone happening to notice the absence of Israeli goods would assume it arose from "commercial, as opposed to political, preferences." *Id.* As in *FAIR*, that means the conduct regulated by Act 710 isn't inherently expressive or protected. *See* ADD16-17.

5

4.  A sharply divided panel disagreed.  Over Judge Kobes's dissent, Judges Kelly and Melloy rejected both the district court's boycott and statutory analyses, rewriting First Amendment precedent and Arkansas's statute.

The majority began with the First Amendment, quickly scuttling *FAIR*.  To do that, the majority simply rejected that case's application here on the grounds that—even though the law schools called their collective association a boycott—"*FAIR* did not concern a boycott."  Op. 9.  Having rejected *FAIR*, the majority then declared that it did not need to decide whether Arkansas's law would "run afoul of the First Amendment if it were limited to purely economic activity."  Op. 12.

Instead, the majority held that while an individual refusal to deal might not be protected, a refusal accompanied by "the company's own statement that it is participating in boycotts of Israel" and evidence that it is done "in association with others" is protected.  Op. 14 (internal quotation marks omitted).  As support, it cited two out-of-circuit district court decisions misreading *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), and holding that refusals to deal "in response to larger calls to action" are protected.  *Jordahl v. Brnovich*, 336 F. Supp. 3d 1016, 1042 (D. Ariz. 2018), *vacated as moot*, 789 F. App'x 589 (9th Cir. 2020); *see Koontz v. Watson*, 283 F. Supp. 3d 1007, 1022 (D. Kan. 2018) (decisive question is whether plaintiff "banded together" with others to oppose Israel).

6

It further argued that its distinction of *FAIR* was supported by supposed differences between protected "politically-motivated" and presumably unprotected economically-motivated boycotts. Op. 10-11 (asking whether *collective* refusal "lacks any expressive or political value"). And having concluded that *FAIR* was inapposite, it didn't have to deal with the inconvenient fact that *FAIR* too involved a politically-motivated, associative refusal to deal. 547 U.S. at 52.

Yet the majority wasn't content to stop there. Instead, recognizing that its argument rested on a weak foundation, it attempted to shore up that foundation by rewriting Arkansas law in a way that would make the protected and unprotected activity appear related. To accomplish that, the majority declared that Act 710's "other actions" language wasn't—as the text would suggest—simply a catchall for unenumerated commercial conduct. *See* Op. 12-13. Rather, the majority decided it must be a vast prohibition on the kind of protected activity that the majority had concluded accompanies calls for collective action. Op. 14-16. And it argued its reading was appropriate because—despite a wealth of contrary authority—it believed Arkansas courts would not apply *ejusdem generis* whenever other "appropriate tools of statutory construction" might tease out a potentially problematic meaning. *See* Op. 13. Then, having upended First Amendment and statutory-construction principles, the majority reversed the district court's decision.

Appellate Case: 19-1378    Page: 11    Date Filed: 03/29/2021 Entry ID: 5019680

Judge Kobes dissented and argued that the panel should have upheld Arkansas's law on the grounds that, properly interpreted, the statute didn't present constitutional problems. Op. 22. In particular, he focused on the majority's refusal to apply a "straight-forward analysis" under *ejusdem generis*. Op. 19. And he stressed that even if that failure were defensible, the majority should have followed the "first and most important rule of statutory interpretation"—that "all doubts are resolved in favor of constitutionality"—and interpreted Act 710 as limited to commercial activity to avoid the majority's constitutional concerns. *Id.* at 21 (quoting *Booker v. State*, 984 S.W.2d 16, 21 (Ark. 1998)).

8

## ARGUMENT

## I.  The majority's boycott analysis conflicts with Supreme Court precedent.

To strike down Arkansas's law prohibiting discrimination against Israeli businesses, the majority ignored basic First Amendment principles.  Under established principles, refusals to deal aren't inherently expressive and entitled to First Amendment protection.  Indeed, absent explanatory speech, a decision not to buy certain goods isn't normally understood as communicative—let alone as an expression of opposition to Israel.  That should have decided this case.

Yet the majority reached the opposite conclusion and placed the laws of 32 States and national policy in jeopardy.  On the majority's view, the question isn't whether the prohibited conduct is expressive, but whether that conduct is "in association with others."  Op. 14.  If it is, then, according to the majority, the conduct is entitled to First Amendment protection.  That gets the First Amendment analysis entirely wrong, undermines the well-established distinction between expression and conduct, and threatens any number of state and federal laws that regulate unexpressive conduct.  En banc rehearing is necessary to avoid that result.

A.  Applying established First Amendment principles, this is a straightforward case.  There's no First Amendment right to boycott Israel, and the district court's order dismissing the complaint should be affirmed.

9

"*FAIR* controls this case." *Jordahl*, *supra*, Doc. 26 at 5 (Ikuta, J., dissenting). Under *FAIR*, conduct that only becomes expressive once its significance is explained—like *not* buying something—isn't entitled to First Amendment protection. Rather, the First Amendment only protects speech or "conduct that is inherently expressive." *FAIR*, 547 U.S. at 66.

The law-school coalition in *FAIR* forced recruiters off-campus because of their disagreement with military policy. *Id.* And contrary to the majority's claim that "*FAIR* did not concern a boycott," Op. 9, the law schools described their collective refusal to deal as a "sort of boycott" and argued that, as such, it was protected expression, Respondents' Br., *FAIR*, 2005 WL 2347175, at \*29 (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982)). When Congress responded by barring schools that received federal funds from discriminating against military recruiters, the law schools challenged that bar on the grounds that it regulated their supposedly expressive conduct of boycotting military recruiters. *See FAIR*, 547 U.S. at 63, 65-66.

The Supreme Court unanimously rejected that argument and held their boycott was "not inherently expressive." *Id.* at 66. Excluding recruiters and requiring them to interview elsewhere was "expressive only because the law schools accompanied their conduct with speech explaining it." *Id.* Absent an explanation, "[a]n observer who s[aw] military recruiters interviewing away from the law school"

10

would have "no way of knowing" why. *Id*. And "explanatory speech" didn't transform the schools' collective, unexpressive conduct into protected expression. *Id*. Indeed, "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Id*.

Under that holding, Arkansas Times's claim likewise fails. "Like the law schools' decision to" bar recruiters, "the decision to engage in a . . . boycott of Israel is 'expressive only if it is accompanied by explanatory speech.'" ADD11 (quoting *Jordahl*, *supra*, Doc. 26 at 5 (Ikuta, J., dissenting)). Certainly, unless a contractor calls attention to the absence of Israel-affiliated companies' goods and explains it, that absence would go both unnoticed and unexplained. *See FAIR*, 547 U.S. at 66; *Jordahl*, *supra*, Doc. 26 at 5 (Ikuta, J., dissenting) (noting "decision not to purchase" goods "is expressive only if it is accompanied by explanatory speech"). And as *FAIR* holds, if conduct needs to be explained to be expressive, it was never expressive to begin with and isn't protected. Thus, to resolve this case, the majority needed only to apply *FAIR*.

B. Yet the majority rejected a straightforward application of *FAIR* on the dubious ground that—whatever the law schools said—"*FAIR* did not concern a boycott." Instead, the majority held Act 710 unconstitutional on the theory that re-

11

acting to calls for political action or boycotting "in association with others" is protected. Op. 14 (citing *Jordahl*, 336 F. Supp. 3d at 1042; *Koontz*, 283 F. Supp. 3d at 1022); *see also* Op. 11 (question is whether refusal, in context, "lacks any expressive or political value"). That approach conflicts with precedent and—if it stands—would transform a broad array of unexpressive conduct into protected expression.

1. Contrary to the majority's reasoning, the First Amendment doesn't protect conduct just because it's "in response to larger calls to action." *See Jordahl*, 336 F. Supp. 3d at 1042. Nor does a statement that a company "is participating in boycotts of Israel" or evidence that it's acting "in association with others" transform otherwise unexpressive conduct into protected expression. Op. 14 (internal quotation marks omitted). Indeed, *FAIR* involved a refusal to deal by an *incorporated* "*association* of law schools" created for the purpose of coordinating boycotting activities, 547 U.S. at 52 (emphasis added), and the Supreme Court still had no trouble concluding their boycott wasn't protected, *see id.* at 68-70. By contrast, the "association with others" the majority thought protected the boycott here merely amounts to boycotting in response to third parties' "calls for a boycott." Op. 14. If that sort of "association with others" transforms a boycott into First Amendment activity, then every boycott would be protected—a bizarre result for a category of unexpressive inaction.

12

Unable to square its associative-boycott rule with the facts or reasoning of *FAIR*, the majority vaguely suggested *Claiborne* supported its approach. But *Claiborne* offers the majority no support either. Instead, *Claiborne* only and unremarkably held that the meetings, speeches, nonviolent picketing, and efforts to persuade that accompanied the boycott in that case were "a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments." 458 U.S. at 907. Indeed, far from holding—as the majority did here—that boycotting in response to boycott-advocacy is protected association, *Claiborne* only held that the "speech, assembly, association, and petition" that *accompanied* the boycott there were "constitutionally protected activity." *Id.* at 911 (emphasis added). That's unsurprising since *Claiborne* was all about whether that traditionally protected activity somehow lost its protection simply because it accompanied unexpressive conduct—not whether boycotting became protected by accompanying protected activity. *See id.* at 908-11.

The threshold question in *Claiborne*, therefore, is the same as in *FAIR*: whether the activity in question is either speech or expressive conduct, not whether it's called a boycott or done in association with others. *See FAIR*, 547 U.S. at 59-60, 65; *Claiborne*, 458 U.S. at 907. And that makes sense. A contrary rule would mean that virtually any activity—even "refusing to pay [one's] income taxes,"

Appellate Case: 19-1378     Page: 17     Date Filed: 03/29/2021 Entry ID: 5019680

*FAIR*, 547 U.S. at 66—would be protected so long as it was done "in association with others," Op. 14.[3]

2.   While that alone warrants further review, the majority's analysis also rests on a flawed distinction between "politically-motivated" and economically-motivated boycotts.  Op. 10.  Citing *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), it found the former were entitled to greater protection than the latter, and it suggested Arkansas's law targeted the former.  *See* Op. 8, 11.  But *FAIR* makes clear the majority has misread *Trial Lawyers*.  For no one could possibly dispute that the boycott in *FAIR* had a political aim, yet *FAIR*'s boycott was unprotected.  *See FAIR*, 547 U.S. at 52 (schools sought to change "the policy Congress has adopted with respect to homosexuals in the military").

Nor for that matter can the majority's reading of *Trial Lawyers* be squared with *International Longshoremen's Ass'n v. Allied International, Inc.*, 456 U.S. 212 (1982).  That earlier case—which the majority doesn't even bother to cite— found no protection for a union's boycott of "handling cargoes arriving from or

---

[3] Contrary to the majority's suggestion, Op. 9, this creates no tension with this Court's recognition that the First Amendment applies when a State "seeks to regulate speech itself as a public accommodation," *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 758 (8th Cir. 2019); *see Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1745 (2018) (Thomas, J., concurring in part and concurring in the judgment) (distinguishing *FAIR* when "government" has "force[d] speakers to alter their *own* message").

14

destined for the Soviet Union" for the expressly political purpose of "protest[ing] the Russian invasion of Afghanistan." *Id.* at 214, 226. Indeed, as the district court put it below, "simply substitut[ing] the words 'labor union,' 'Soviet,' 'U.S.S.R.,' and 'Afghanistan' with 'newspaper,' 'Israeli,' 'Israel,' and 'West Bank'" makes clear that *Longshoremen* "is largely the same case as" this one. ADD15.

The majority's distinction therefore lacks support, and this Court should grant rehearing to hold that "an effort to use economic power to coerce a foreign government through economic means may subject the participants to loss of state government contracts." *Amici Curiae* Br. of Profs. Michael Dorf, Andrew Koppelman, and Eugene Volokh (June 5, 2019), Entry ID: 4794442, ECF p.17.

## II. The majority's opinion undermines basic principles of statutory construction.

Recognizing that it couldn't square its boycott analysis with *FAIR*, the majority attempted to bolster that analysis by construing Arkansas law in a way that lumped speech, association, and unexpressive conduct together. But the majority's approach to statutory interpretation violates bedrock principles of statutory construction and, if it stands, would have serious implications for the interpretation of state laws throughout this circuit.

Act 710 "prohibits public entities from contracting with companies that boycott Israel by (1) 'engaging in refusals to deal'; (2) 'terminating business activities'; or (3) taking 'other actions that are intended to limit commercial relations

Appellate Case: 19-1378    Page: 19    Date Filed: 03/29/2021 Entry ID: 5019680

with Israel' . . . 'in a discriminatory manner.'"  Dissent 18 (quoting Ark. Code Ann. 25-1-502(1)(A)(i), -503(a)(1)).  Under a "straight-forward analysis," *ejusdem generis* requires interpreting the "other actions" provision to apply "solely to commercial activities."  Dissent 19.

That's how Arkansas courts would have interpreted it.  For they regularly apply *ejusdem generis* to similar phrases.  *See, e.g.*, *Edwards v. Campbell*, 370 S.W.3d 250, 253 (Ark. 2010) (applying *ejusdem generis* to "embezzlement of public money, bribery, forgery or other infamous crime").  And this Court has interpreted similar phrases in Arkansas law "to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Universal Coops., Inc. v. AAC Flying Serv., Inc.*, 710 F.3d 790, 795 (8th Cir. 2013) (quoting *Hanley v. Ark. State Claims Comm'n*, 970 S.W.2d 198, 201 (Ark. 1998)).

Conversely, there's no precedent for the majority's refusal to apply *ejusdem generis* based on the "legislative intent and purpose."  Op. 13 (emphasis and citation omitted).  It rests on a misunderstanding of the maxim that *ejusdem generis* be used "to carry out, not to defeat, legislative intent."  *Wallis v. State*, 16 S.W. 821, 822 (Ark. 1891).  This maxim applies only when *ejusdem generis* would violate "the elemental canon of construction that no word is to be treated as unmeaning."  *Id.*; *see, e.g.*, *Compton v. State*, 143 S.W. 897, 900 (Ark. 1911) (rejecting interpretation that "would render the clause meaningless").  Applying *ejusdem generis*

16

here wouldn't violate that canon. *See* Dissent 19 (explaining how "charging overly inflated shipping prices . . . to reduce commercial relationships with [Israel]" would violate other-actions clause, but not be a literal "refusal to deal or a termination").

Interpreted according to *ejusdem generis*, the "other actions" language presents no issue. But that approach did not fit the majority's faulty boycott analysis, and as a result, it rejected that "reasonable interpretation" in favor of a much broader construction that covered expressive activities that sometimes accompany refusals to deal. Op. 12-13. Yet far from justifying such a radical departure from hornbook principles of statutory construction, the majority simply declared that other "appropriate tools of statutory construction" pointed to a different result. Op. 13. Those other tools, however, amounted to little more than a survey of "the types of evidence permitted to prove intent," an "overbroad[] and inconsistent[]" reading of a legislative "policy statement," and a citation to a confusingly drafted certification. Dissent 19 n.13.

Moreover, even that couldn't possibly justify an interpretation that would raise constitutional problems in the face of an unproblematic "plausible construction." Op. 13. The majority violated "[t]he first and most important rule of statutory interpretation" in Arkansas—that "all doubts are resolved in favor of constitutionality." Dissent 21 (quoting *Booker*, 984 S.W.2d at 21). And this Court has

17

previously applied constitutional-avoidance principles as a matter of federal law, even when interpreting state statutes. *See Planned Parenthood of Mid-Mo. & E. Kan., Inc. v. Dempsey*, 167 F.3d 458, 461-64 (8th Cir. 1999).

Thus, the majority's approach conflicts with—and undermines—basic principles of statutory construction, and if allowed to stand, it will complicate countless cases in this Circuit that involve the interpretation of Arkansas law. Indeed, under the majority's approach, when an issue of Arkansas law arises, courts in this circuit won't be permitted to simply apply straightforward canons of statutory construction. Rather, they'll have to conduct a sweeping inquiry designed to ferret out problems that aren't obvious on the face of the statute. And it's hard to see how the majority's approach could be cabined to Arkansas cases since most state rules of interpretation rest on similar common-law foundations.

*        *        *        *

The majority's decision undermines core First Amendment principles and hornbook rules of statutory interpretation. If it stands, that decision will render this Circuit an outlier in both categories. To prevent that, this Court should grant en banc review, apply well-established constitutional and statutory principles, and affirm the decision below.

18

## CONCLUSION

For these reasons, this petition should be granted.

Respectfully submitted,

LESLIE RUTLEDGE
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

VINCENT M. WAGNER
  Deputy Solicitor General

DYLAN L. JACOBS
ASHER STEINBERG
  Assistant Solicitors General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-6302
nicholas.bronni@arkansasag.gov

19

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation of Fed. R. App. P. 35(b)(2)(A) because it contains 3,893 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this document complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman, using Microsoft Office.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ Nicholas J. Bronni
Nicholas J. Bronni

# CERTIFICATE OF SERVICE

I certify that on March 29, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

*/s/  Nicholas J. Bronni*
Nicholas J. Bronni